841 A.2d 471 (2004)
366 N.J. Super. 391
Rosa CRESPO, Plaintiff-Respondent,
v.
EVERGO CORPORATION and Inuk Lee, Individually, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 2004.
Decided February 9, 2004.
*472 Warren J. Kaps, Hackensack, argued the cause for appellants (Kaps & Barto, attorneys; Mr. Kaps and Raymond Barto, on the brief).
Matthew R. Grabel argued the cause for respondent (Grabell & Associates, attorneys; Mr. Grabell, on the brief).
Before Judges CONLEY, CARCHMAN and WEISSBARD.
The opinion of the court is delivered by CONLEY, P.J.A.D.
Plaintiff Rosa Crespo, an illegal alien, brought an action under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, against her employer, defendant Evergo Corporation, and against her immediate supervisor, defendant Inuk Lee, claiming discriminatory termination. Pursuant to the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C.A. § 1324a, and the United States Supreme Court's ruling in Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (Hoffman), the trial judge granted partial summary judgment barring plaintiff's claim for economic damages (back pay, front pay, and lost benefits), but allowed her to pursue non-economic damages (emotional distress damages, punitive damages and counsel fees). On leave granted, defendants appeal the interlocutory order allowing plaintiff to pursue non-economic damages. We reverse and remand for a dismissal of the entire complaint.
As presented in the context of plaintiff's particular claims, the issue before us is *473 quite narrow. Specifically, the complaint alleges discrimination in defendants' alleged refusal to allow plaintiff to return to employment after her maternity leave. It does not allege workplace sexual harassment or that any other LAD misconduct occurred during the course of plaintiff's employment. This appeal, then, does not call upon us to determine whether an employee's illegal alien status would shield a LAD-offending employer from non-economic damages. But see Taylor v. International Maytex Tank Terminal Corp., 355 N.J.Super. 482, 497-98, 810 A.2d 1109 (App.Div.2002). In the context of plaintiff's claims, we agree with the motion judge's determination that IRCA, as applied by the Supreme Court of the United States in Hoffman, bars plaintiff's economic damages. We see no basis for distinguishing her related non-economic damages and conclude they, too, are barred.
The facts are not in dispute. On March 24, 2000, plaintiff started working with Evergo as a warehouse employee after presenting a social security card and representing that she was legally entitled to work in the United States. It is undisputed that the social security card was fraudulent and that plaintiff was not a legal citizen. Defendants did not learn this until after she filed her complaint.
In March 2001, plaintiff informed her immediate supervisor, defendant Lee, that she was pregnant. In October 2001, she stopped working. In December 2001, plaintiff was ready to return to work. When she called to arrange for her return, defendant Lee's secretary told her that Lee had said that business was slow and that she should call back in January 2002. She was specifically informed that Lee had said she could not, at that time, come back to work. When she called in January, the secretary said that Lee was on vacation and he could not talk to her. Plaintiff, therefore, alleges that she was terminated in January 2002. Following the last phone call, plaintiff alleges that she learned another person had been hired to perform the same or a similar job.[1] She also learned that Lee had commented that plaintiff was not permitted to return because "`she just had a baby and people like her are irresponsible.'"[2]
Pursuant to IRCA, 8 U.S.C.A. §§ 1324a(a)(1) and (a)(2), it is illegal for an employer to knowingly hire aliens who are not authorized to work in the United States, or to continue employing such aliens with the knowledge that those workers are or have become unauthorized to work. Thus, "if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status." Egbuna v. Time-Life Libraries, Inc., 153 F.3d 184, 187 (4th Cir.1998). "IRCA thus statutorily disqualifies any undocumented alien from being *474 employed as a matter of law." Ibid. Similarly, IRCA makes it a crime for an illegal alien to use fraudulent documents in obtaining employment. 8 U.S.C.A. § 1324c(a).
LAD is not contradictory. Indeed, although it provides that all persons shall have the opportunity to obtain employment without being discriminated against, N.J.S.A. 10:5-4, it also provides that it shall not be unlawful under the LAD for an employer to "restrict employment to citizens of the United States where such restriction is required by federal law...." N.J.S.A. 10:5-12(a).
In Hoffman, the Court expressly held that an NLRB award of back pay to an illegal alien "is foreclosed by federal immigration policy, as expressed by Congress in the Immigration Reform and Control Act of 1986." Id. at 137, 122 S.Ct. at 1278, 152 L.Ed.2d at 276. Describing IRCA as a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," the Supreme Court found that it "`forcefully' made combating the employment of illegal aliens central to the `policy of immigration law.'" Id. at 147, 122 S.Ct. at 1282, 152 L.Ed.2d at 281. As part of this scheme, the Court noted:
if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status. § 1324a(a)(2).... IRCA also makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents. § 1324c(a). It thus prohibits aliens from using or attempting to use "any forged, counterfeit, altered, or falsely made document" or "any document lawfully issued to or with respect to a person other than the possessor" for purposes of obtaining employment in the United States. §§ 1324c(a)(1)-(3). Aliens who use or attempt to use such documents are subject to fines and criminal prosecution. 18 U.S.C. § 1546(b)....
Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations.
[Id. at 148, 122 S.Ct. at 1283, 152 L.Ed.2d at 281-82.]
The facts in Hoffman are as follows. In 1988, Jose Castro was hired by Hoffman to work in its plastics production facility. At the time of hiring, Hoffman relied on documents that Castro had presented that appeared to verify his right to work in the United States. Shortly thereafter, a union launched an organizing campaign at Hoffman's production plant. Castro participated in the campaign by distributing union authorization cards. In 1989, to rid the company of union supporters, Hoffman selected known union supporters in its workforce for layoff. Castro was one of the workers who was terminated. One discharged employee filed charges with the National Labor Relations Board (NLRB). Three years later, the NLRB found that the layoffs violated the National Labor Relations Act (NLRA) and ordered Hoffman to reinstate and award back pay to the illegally fired workers, including Castro. During a compliance hearing in 1993, however, Castro admitted to the Administrative Law Judge (ALJ) that he was an illegal worker who had tendered fraudulent papers to secure employment with Hoffman. The ALJ determined that because *475 of Castro's illegal status, he could not be awarded back pay or be reinstated because such a remedy would conflict with IRCA's provisions that prohibit employers from knowingly hiring illegal aliens using fraudulent documents to obtain employment. The NLRB, nevertheless, overturned the ALJ's findings. It determined that back pay would be the most effective way to further the immigration policies in IRCA by insuring that the NLRA's protections and remedies extended to undocumented workers in the same manner as to other employees. 535 U.S. at 140-42, 122 S.Ct. at 1278-79, 152 L.Ed.2d at 277.
The Court reversed the NLRB. In doing so, it observed "that where the Board's chosen remedy trenches upon a federal statute or policy outside the Board's competence to administer, the Board's remedy may be required to yield." 535 U.S. at 147, 122 S.Ct. at 1282, 152 L.Ed.2d at 281. The Court reexamined its decision in Sure-Tan, Inc. v. N.L.R.B., 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), a factually similar case where the Court permitted the awarding of back pay to illegal aliens as long as they were lawfully entitled to be present and employed in the United States in order to collect. Rather than clarify the scope of Sure-Tan's language, the Supreme Court focused on the fact that the "legal landscape" had now "significantly changed," specifically because Congress had enacted IRCA. 535 U.S. at 147, 122 S.Ct. at 1282, 152 L.Ed.2d at 281. Thus, the Court concluded that illegal aliens cannot pursue an award for unfair labor practices under the NLRA in light of the strong and countervailing policies behind IRCA. 535 U.S. at 149-52, 122 S.Ct. at 1283-84, 152 L.Ed.2d at 282-84. "It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations." 535 U.S. at 151, 122 S.Ct. at 1284, 152 L.Ed.2d at 284. Moreover, the Court questioned but declined to address "whether awarding back pay to undocumented aliens, who have no entitlement to work in the United States at all, might constitute a prohibited punitive remedy against an employer." 535 U.S. at 152 n. 6, 122 S.Ct. at 1285 n. 6, 152 L.Ed.2d at 284 n. 6 (citation omitted).
To be sure, Hoffman has not been expanded beyond its specific focus. See Zeng Liu v. Donna Karan Int'l, Inc., 207 F.Supp.2d 191, 192-93 (S.D.N.Y.2002) (Hoffman did not apply to preclude an illegal alien's claims under the federal Fair Labor Standards Act (FLSA) for work already performed); Singh v. Jutla & C.D. & R's Oil, Inc., 214 F.Supp.2d 1056, 1061-62 (N.D.Cal.2002) (an illegal alien who was arrested and detained for fourteen months immediately following settlement of a FLSA suit against his employer could proceed with an FLSA retaliation claim against the employer); Escobar v. Spartan Security Serv., 281 F.Supp.2d 895, 896-98 (S.D.Tex.2003) (plaintiff, who sued his former employer alleging workplace sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, was not entitled to back pay because he was an illegal alien at the time of the events but was not barred from his other remedies, including reinstatement and front pay, because he had subsequently attained his legal work status prior to trial). Cf. Murillo v. Rite Stuff Foods, Inc., 65 Cal. App.4th 833, 77 Cal.Rptr.2d 12, 23 (1998) (workplace sexual harassment plaintiff not precluded from emotional distress claims arising from harassment during employment but was barred, in light of IRCA, from wrongful discharge damage claims).
Further, our pre-Hoffman decisions have not precluded illegal aliens from pursuing relief under our workers' compensation law. See Fernandez-Lopez v. Jose *476 Cervino, Inc., 288 N.J.Super. 14, 17-18, 671 A.2d 1051 (App.Div.1996); Mendoza v. Monmouth Recycling Corp., 288 N.J.Super. 240, 248-49, 672 A.2d 221 (App.Div. 1996). Even after Hoffman, courts in other states have held that IRCA does not preclude illegal aliens from receiving workers' compensation benefits. Correa v. Waymouth Farms, Inc., 664 N.W.2d 324, 329 (Minn.2003); Reinforced Earth Co. v. Workers' Comp. Appeal Bd., 570 Pa. 464, 810 A.2d 99, 104-05, 108 (2002). But see Sanchez v. Eagle Alloy, Inc., 254 Mich. App. 651, 658 N.W.2d 510, 521 (2003) (under Hoffman and Michigan statutes, illegal aliens were not eligible for workers' compensation wage-loss benefits after the date when their illegal employment status was discovered), appeal granted, 671 N.W. 2d 874 (Mich.2003).
Furthermore, New Jersey's "well established body of law holds that illegal aliens have rights of access to the courts and are eligible to sue therein to enforce contracts and redress civil wrongs such as negligently inflicted personal injuries." Montoya v. Gateway Ins. Co., 168 N.J.Super. 100, 104, 401 A.2d 1102 (App.Div.), certif. denied, 81 N.J. 402, 408 A.2d 796 (1979). Accord Tyson Foods, Inc. v. Guzman, 116 S.W.3d 233, 244 (Tex.Ct.App.2003); Cano v. Mallory Mgmt., 195 Misc.2d 666, 760 N.Y.S.2d 816, 817-18 (Sup.Ct.2003).
In contrast, where the governing workplace statutory scheme makes legal employment a prerequisite to its remedial benefits, a worker's illegal alien status will bar relief thereunder. Bastas v. Bd. of Review in Dep't of Labor & Indus., 155 N.J.Super. 312, 315, 382 A.2d 923 (App. Div.1978) (unemployment compensation benefits not available to illegal alien because of statutory requirement that employee be eligible for work). Accord Pinilla v. Bd. of Review in Dep't of Labor & Indus., 155 N.J.Super. 307, 311, 382 A.2d 921 (App.Div.1978). Indeed, in Bastas v. Bd. of Review in Dep't of Labor & Indus., we observed that although illegal aliens "have certain rights[,] ... an illegal alien or an alien who is here as a temporary visitor for pleasure and without authority to become gainfully employed cannot lawfully work. There is no constitutional right to work illegally." 155 N.J.Super. at 315, 382 A.2d 923.
In reaching our conclusion here that plaintiff's disqualification from legal employment precludes her termination damages, both economic and non-economic damages, we consider our Supreme Court's decision in Cedeno v. Montclair State Univ., 163 N.J. 473, 750 A.2d 73 (2000). There, plaintiff had pled nolo contendere to four counts of bribery. Sometime later, he applied for and was hired by the Montclair State University as the director of purchasing. In his application he had answered in the negative to a question on his job application as to whether he had any criminal convictions. After being discharged from his position, plaintiff filed a complaint alleging a LAD discriminatory discharge and a Conscientious Employee Protection Act (CEPA) retaliatory discharge, seeking economic and non-economic damages. During discovery, the university learned about plaintiff's bribery conviction and moved for summary judgment based upon the Forfeiture Statute, N.J.S.A. 2C:51-2(d), which precludes a person convicted of a crime from public employment. The motion was denied but on appeal to us we reversed. In doing so, we concluded that in light of the strong policy served by the Forfeiture Statute, both economic and non-economic damages were precluded, despite the equally strong policies served by LAD and CEPA. The Court affirmed. Id. at 479, 750 A.2d 73. Thus, the Court barred the plaintiff's recovery of all remedies that *477 might otherwise have been available under LAD and CEPA. Nevertheless, the Court agreed with our observation that:
We can conceive of other circumstances, such as the aggravated sexual harassment alleged in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993), where the need to vindicate the policies of the LAD or CEPA and to compensate an aggrieved party for tangible physical or emotional harm could lead to the conclusion that even a person who was absolutely disqualified from holding public employment should be allowed to seek compensation for harm suffered during that employment.
[Cedeno v. Montclair State Univ., 319 N.J.Super. 148, 159-60, 725 A.2d 38 (App.Div.1999), aff'd, 163 N.J., supra, at 479, 750 A.2d 73.]
In light of Hoffman's strong enforcement of the policies served by ICRA, at least as they presently exist, we think plaintiff's statutory bar from employment is similar to the plaintiff's statutory bar in Cedeno. Because there are no "aggravated sexual harassment" or other egregious circumstances which exist here, we reach the same conclusion, that is that her statutory bar precludes both economic and non-economic damages which might have been caused by her termination.
We briefly address plaintiff's reliance on Taylor v. International Maytex Terminal Corp., supra, 355 N.J.Super. 482, 810 A.2d 1109. There, plaintiff brought a LAD complaint against his employer claiming, among other misconduct, racially motivated discriminatory treatment, hostile work environment, racially motivated failure to promote and denial of equal pay. During the course of discovery, defendant learned plaintiff had been involved in a cover-up of a jobsite chemical spill. Had defendant known of the spill and plaintiff's involvement, he would have been fired. On the basis of the equitable "after-acquired" evidence doctrine, the trial judge granted defendant's motion barring both economic and non-economic damages. We agreed as to the economic, but reversed as to the non-economic, concluding that "[a]n employer who creates a hostile work environment should not be excused from responding in damages for personal injuries caused by its discriminatory conduct simply because it later learns that the injured employee did something in the past which, if known at the time, would have caused his or her termination." Id. at 498, 810 A.2d 1109.
Here, plaintiff's claims arise solely from her termination. They have nothing to do with defendants' treatment of her during the course of her employment. Moreover, it is not just employee conduct which disqualifies her from employment, but rather a Congressionally mandated disqualification, violation of which imposes criminal liability upon not only the employer but the employee as well. Just as in Cedeno, then, it is the illegality of plaintiff's employment which precludes both economic and non-economic damages she claims resulted from the termination of that employment.
The grant of summary judgment to defendant as to economic damages is affirmed, the denial as to non-economic damages is reversed. The matter is remanded for entry of judgment dismissing the complaint. We decline to address defendants' claim for counsel fees as it was not ruled upon by the trial judge.
Reversed and remanded.
NOTES
[1] According to defendants, plaintiff was excessively absent and received too many personal phone calls, and in September 2001, "she no longer came to work." They also alleged that no one had been hired to replace plaintiff and that her position was still open. It is undisputed that plaintiff was offered reemployment in February 2002 which she refused.
[2] Neither the complaint nor plaintiff's legal arguments in her brief assert a claim for workplace harassment or any other misconduct during the course of her work for defendants. During oral argument, it was suggested that the above comment would support a claim for workplace harassment. We disagree. The comment, assuming it to have been made, was conveyed to plaintiff after the January 2002 termination. There is not even a hint that she was subjected to LAD offending conduct while she was at the workplace.